[Cite as *State v. Kimble*, 2025-Ohio-76.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

TIMOTHY R. KIMBLE,

    DEFENDANT-APPELLANT.

CASE NO. 13-24-09

O P I N I O N

Appeal from Seneca County Common Pleas Court
Trial Court No. 22 CR 0256

**Judgment Affirmed**

Date of Decision: January 13, 2025

APPEARANCES:

    *Brian A. Smith* for Appellant

    *Derek W. DeVine* for Appellee

**WALDICK, P.J.**

{¶1} Defendant-appellant, Timothy Kimble ("Kimble"), appeals the judgment of conviction and sentence entered against him in the Seneca County Court of Common Pleas, following a trial to the court on a ten-count indictment charging a variety of sex offenses. For the reasons set forth below, we affirm.

*Procedural History*

{¶2} This case originated on December 21, 2022, when a Seneca County grand jury returned an indictment against Kimble, charging him as follows: Count 1 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); Count 2 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); Count 3 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); Count 4 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); Count 5 – Gross Sexual Imposition, a third-degree felony in violation of R.C. 2907.05(A)(4); Count 6 – Disseminating Matter Harmful To Juveniles, a fourth-degree felony in violation of R.C. 2907.31(A)(1) and (F); Count 7 – Disseminating Matter Harmful To Juveniles, a fourth-degree felony in violation of R.C. 2907.31(A)(1) and (F); Count 8 – Disseminating Matter Harmful to Juveniles, a fourth-degree felony in violation of R.C. 2907.31(A)(1) and (F); Count 9 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); and Count 10 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b).

**{¶3}** On December 27, 2022, an arraignment was held and Kimble pled not guilty to all counts in the indictment. Fourteen months of pretrial proceedings then ensued, during which time the trial date was continued and rescheduled several times upon motions filed by both parties.

**{¶4}** On November 29, 2023, Kimble appeared in open court with counsel and executed a written waiver of trial by jury.

**{¶5}** On February 26, 2024, a bench trial commenced in the case. During the first two days of the trial, the State of Ohio presented the testimony of nine witnesses and introduced numerous exhibits. On February 28, 2024, after the prosecution rested its case, Kimble moved for acquittal pursuant to Crim.R. 29. The trial court granted the motion for acquittal as to Count 7, but overruled the motion as to all other counts. The defense then presented the testimony of four witnesses and introduced several exhibits before resting its case near the end of the day on February 28, 2024. At that time, following closing arguments by counsel, the trial court adjourned the proceedings in order to deliberate on the counts at issue.

**{¶6}** On March 1, 2024, the trial court announced its verdicts in open court, finding Kimble guilty as charged on Counts 1 through 6, and on Count 8. On Counts 9 and 10, the trial court found Kimble guilty on each count of the lesser included offense of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4). Later that same date, the trial court filed a judgment entry reflecting its verdicts.

{¶7} On March 5, 2024, a sentencing hearing was held and Kimble was sentenced as follows: Count 1 – an indefinite prison term of 25 years to life; Count 2- an indefinite prison term of 25 years to life; Count 3 – an indefinite prison term of 25 years to life; Count 4 – an indefinite prison term of 25 years to life; Count 5 – 54 months in prison; Count 6 – 17 months in prison; Count 8 – 17 months in prison; Count 9 – 54 months in prison; and Count 10 – 54 months in prison. The trial court ordered that the sentences on Counts 1 and 2 be served consecutively, with the sentences on the remaining counts to be served concurrently with the sentences on Counts 1 and 2, for an aggregate sentence of 50 years to life in prison. Later that same date, the trial court filed its judgment entry of sentence.

{¶8} On March 8, 2024, Kimble filed the instant appeal, in which he raises three assignments of error for our review.

## First Assignment of Error

**Because the jury lost its way and created a manifest miscarriage of justice in convicting Appellant, Appellant's convictions were against the manifest weight of the evidence.**

## Second Assignment of Error

**Because the trial court acted in an arbitrary, unconscionable, and unreasonable manner in refusing to continue the trial, the trial court abused its discretion in denying Appellant a continuance to allow Appellant to subpoena Hollie Kimble as a witness, in violation of Appellant's right to Due Process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.**

**Third Assignment of Error**

**Because the trial court acted in an arbitrary, unconscionable, and unreasonable manner, the trial court abused its discretion in granting the State's Motion to Quash the subpoena issued to K.K., in violation of Appellant's right to Due Process under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution, as well as Appellant's right to confrontation of witnesses under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

*First Assignment of Error*

{¶9} In the first assignment of error, Kimble asserts that his convictions were against the manifest weight of the evidence.

{¶10} When reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate

court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

{**¶11**} In the instant case, as to Counts 1, 2, 3, and 4, Kimble was found guilty of Rape in violation of R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." As set forth in R.C. 2907.01(A), "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." "Penetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id.*

{**¶12**} On Counts 5, 9 and 10, Kimble was found guilty of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), which provides that "[n]o person shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." As set forth in R.C. 2907.01(B), "sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the

person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶13} On Counts 6 and 8, Kimble was found guilty of Disseminating Matter Harmful To Juveniles in violation of R.C. 2907.31(A)(1), which provides in relevant part that "[n]o person, with knowledge of its character or content, shall recklessly * * * directly * * * furnish, * * * exhibit, * * * or present to a juvenile * * * any material or performance that is obscene or harmful to juveniles[.]". As set forth in R.C. 2907.01(E), "harmful to juveniles" means "that quality of any material or performance describing or representing nudity, sexual conduct, sexual excitement, or sado-masochistic abuse in any form to which all of the following apply: (1) [t]he material or performance, when considered as a whole, appeals to the prurient interest of juveniles in sex[;] (2) [t]he material or performance is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for juveniles[;] (3) [t]he material or performance, when considered as a whole, lacks serious literary, artistic, political, and scientific value for juveniles." As set forth in R.C. 2907.01(F), "[w]hen considered as a whole, and judged with reference to ordinary adults or, if it is designed for sexual deviates or other specially susceptible group, judged with reference to that group, any material or performance is 'obscene' if any of the following apply: (1) [i]ts dominant appeal is to prurient interest; (2) [i]ts dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that

tends to represent human beings as mere objects of sexual appetite; (3) [i]ts dominant tendency is to arouse lust by displaying or depicting bestiality or extreme or bizarre violence, cruelty, or brutality; (4) [i]ts dominant tendency is to appeal to scatological interest by displaying or depicting human bodily functions of elimination in a way that inspires disgust or revulsion in persons with ordinary sensibilities, without serving any genuine scientific, educational, sociological, moral, or artistic purpose; (5) [i]t contains a series of displays or descriptions of sexual activity, masturbation, sexual excitement, nudity, bestiality, extreme or bizarre violence, cruelty, or brutality, or human bodily functions of elimination, the cumulative effect of which is a dominant tendency to appeal to prurient or scatological interest, when the appeal to such an interest is primarily for its own sake or for commercial exploitation, rather than primarily for a genuine scientific, educational, sociological, moral, or artistic purpose."

{¶14} The convictions in this case are based on sexual offenses alleged to have been perpetrated by Kimble upon three of his minor grandchildren: "A.K.1" ("Jane Doe #1" in Counts 1, 2, 3, 4, and 6 of the indictment); her sister, "A.K.2" ("Jane Doe #2" in Count 5 of the indictment), and their cousin "K.K." ("Jane Doe #3" in Counts 8, 9, and 10 of the indictment), from the year 2020 until October of 2022.

{¶15} At trial, the evidence established that, for all times relevant to the case, A.K.1 and A.K.2 lived in Licking County, Ohio with their parents and siblings, and

K.K. lived in Colorado with her parents and other family members. Kimble and his wife, Cheryl, were long-time residents of a home located in Seneca County and, through the years, A.K.1, A.K.2, and K.K. frequently visited and stayed at their grandparents' house.

{¶16} The case originated in late November of 2022, when A.K.1 disclosed to her mother that she had been subjected to ongoing sexual abuse by Kimble. After a forensic interview of A.K.1. was completed by the Department of Job and Family Services in Licking County, and after A.K.2 and K.K. also came forward with allegations against Kimble, the Seneca County Sheriff's Office was made aware of the allegations and an investigation was initiated.

{¶17} On December 1, 2022, law enforcement personnel executed a search warrant at Kimble's home and arrested Kimble. During the search of the house, a black bag was located on top of a gun cabinet in Kimble's bedroom. The bag was filled with numerous sex toys, including multiple vibrators, a dildo, and two penis rings. In that same bag, investigators also located a bottle of Adam & Eve all-purpose toy cleaner, and a bottle of Adam & Eve lubricant. Kimble's personal cell phone was also seized during the execution of the search warrant, as was his electronic tablet.

{¶18} At trial, A.K.1 testified that she was 11 years old. She identified Kimble as her grandfather and his wife, Cheryl, as her grandmother. A.K.1 testified that she previously spent a lot of time at her grandparents' house. When asked if,

at some point, things changed with Kimble, A.K.1 said yes, because he touched her. A.K.1 testified that Kimble began using his finger to touch her in her vagina and in her butt, and that those incidents took place in Kimble's bedroom, on the couch, in the swimming pool, and in the barn. A.K.1 testified that Kimble also touched her in her vagina and butt when she was on his 4-wheeler with him. She said that it hurt physically and made her feel very uncomfortable. A.K.1 testified that Kimble would also use "tools" to touch her, which she described as "vibration" objects. (Tr., 120-121). A.K.1 said that the tools were various colors, that there was a purple one, a pink one, and a silver one, and that Kimble would put the tools in her vagina or butt. A.K.1 further testified that Kimble put his penis into her butt and into her vagina and that, when doing so, he put what she thought was Vaseline in her private areas. A.K.1 testified that Kimble wanted to put his penis in her mouth but she said no. When asked if she ever saw anything come out of his penis, A.K.1 said yes, and described it as a clear or white liquid. Kimble also had a cell phone and tablet and would use those devices to show videos to A.K.1. A.K.1 testified that the videos showed people having intercourse and that, while watching them, Kimble would tell her that they should do those things. At trial, A.K.1 also identified some of the sex toys recovered from Kimble's home as being the ones he used on her. She testified that he kept the devices in a black bag in his bedroom. A.K.1 testified that she finally told her mother what Kimble was doing because she got her first period.

{¶19} A.K.2 testified that she was ten years old at the time of trial, and she identified Kimble as her grandfather and Kimble's wife, Cheryl, as her grandmother. A.K.2 testified that Kimble is her father's dad. A.K. 2 testified that A.K.1 is her older sister and that both of them, along with their younger brothers, would frequently go to Kimble and Cheryl's house. A.K.2 testified that she referred to her private parts as "vagina" and "butt", and she explained that a vagina is located "in between your legs." (Tr., 190). When asked if somebody had touched her vagina, A.K.2 testified that Kimble did. She testified that this happened for approximately two years and occurred almost every time she was there at his home, and that it took place in various rooms in the house, and also in the barn and in the pool. A.K.2 testified that she finally told her mother about it after her sister revealed what had been happening. A.K.2. testified that she did not say something sooner to her parents because she was scared.

{¶20} K.K. testified that she was ten years old at the time of trial and that she lived in Colorado. She identified Kimble as her grandfather, on her dad's side of the family. K.K. testified that A.K.1 and A.K.2. are two of her cousins and that she would see them on visits to Kimble's house. K.K. testified that she visited her grandparents' house three to five times per year. K.K. testified that she typically stayed at Kimble's home in the summer and that, while there, she and her cousins would play in the pool, ride the 4-wheeler, and play other games outside. When asked if things changed at some point between her and her grandfather, K.K.

answered affirmatively. When asked what happened to cause that, K.K. testified that Kimble touched her butt and her vagina with his finger. K.K. testified that his finger did not go inside of her vagina or butt, but that those areas throbbed with pain and discomfort when he touched them. K.K. testified that those incidents took place in Kimble's living room, but also in the pool and on the 4-wheeler. K.K. confirmed that Kimble had a cell phone and testified that he would show her videos of undressed people doing the same thing that he had done to her.

{¶21} The evidence at trial also established that law enforcement performed a data extraction on Kimble's cell phone. That extraction revealed that more than a thousand pornographic images were stored on the phone, including a number of digital images depicting what appeared to be minor females in a state of nudity who were engaging in various sexual acts. Thirteen of those pornographic images depicting females who appeared to be minors were introduced in evidence at trial.

{¶22} Finally, the evidence reflected that several of the sex toys recovered from Kimble's bedroom, along with the bag they were found to be stored in, were submitted to the Ohio Bureau of Investigation ("BCI") for analysis. Emily Feldenkris, a forensic scientist employed by BCI and an expert in the field of DNA forensic analysis, testified that DNA with a profile consistent to A.K.1's DNA was found on the inside of the bag, along with DNA consistent with Kimble's DNA.

{¶23} On appeal, Kimble does not suggest that the State of Ohio failed to introduce evidence in support of any of the particular elements of the offenses at

issue. Rather, Kimble argues more generally that his convictions were against the manifest weight of the evidence because the State's evidence, particularly the testimony of A.K.1, A.K.2, and K.K., was not credible.

**{¶24}** In support of his manifest-weight claim, Kimble asserts that the minor victims' testimony was unreliable and inconsistent with other evidence. Specifically, Kimble argues that A.K.1 was not credible because she may have been influenced by her mother to make allegations against Kimble, and also because A.K.1's DNA was found in the bag containing the sex toys but not on any of the sex toys themselves that were tested for DNA. Kimble argues that A.K.2 was not credible because she did not disclose the abuse when first interviewed by the authorities but, instead, disclosed the abuse to her mother approximately one week after the initial interview. Kimble argues that K.K. was not credible because she testified that her therapist helped her in preparing herself for the trial. Kimble also asserts that evidence of the somewhat open layout of his small ranch-style home and of the typical sleeping arrangements when visitors were there weighs heavily against conviction. Finally, Kimble argues that the evidence of him disseminating matter harmful to juveniles is outweighed by the fact that persons other than Kimble also had access to his cell phone and therefore someone else could have been responsible for acquiring the pornographic images found on the phone.

**{¶25}** However, following this Court's thorough review of the record and the evidence presented, we find that any arguable "inconsistencies" in the victims'

-13-

testimony when compared to the other evidence, particularly that evidence highlighted by Kimble, were all very minor and, when considered in light of all the evidence, fall well short of making the victims' testimony inherently unworthy of belief. Additionally, "[i]t is well established that '[i]nconsistencies in the evidence alone do not mean that a decision is against the manifest weight of the evidence.'" *State v. Nkoyi*, 2024-Ohio 3144, ¶ 39 (12th Dist.), quoting *State v. Gregory*, 2023-Ohio-1700, ¶ 16 (12th Dist.).

**{¶26}** Also, particularly as to A.K.1, we note that her testimony was strongly corroborated by other evidence. During her initial interview, prior to the search warrant being executed, A.K.1 described several sexual devices that were used on her by Kimble, and sex toys matching those descriptions were found during the search warrant, in the location where A.K.1 had previously stated they were kept. Regarding the sexual images that were shown to her by Kimble, A.K.1 also provided a detailed description of the cell phone that he used to show her the pornography, and then pornography was, in fact, found on that phone as she had previously described.

**{¶27}** Most importantly, the trial court – as the trier of fact – was able to see and hear the testimony and was free to believe or disbelieve any or all of that testimony. *See e.g. State v. Shockey*, 2024-Ohio-296, ¶ 24 (3d Dist.), citing *State v. Jones*, 2022-Ohio-2089, ¶ 28 (3d Dist.). "The factfinder is in the best position to evaluate credibility of witnesses, and we will not second-guess the factfinder on

these matters." *State v. Bennett*, 2019-Ohio-4937, ¶ 59 (3d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231.

**{¶28}** In sum, Kimble's arguments are not convincing and this is not the exceptional case in which the evidence weighs heavily against the convictions. Given the strength of the overall evidence, we find that the trial court neither lost its way nor created a miscarriage of justice in finding Kimble guilty on the nine counts at issue.

**{¶29}** As Kimble's convictions were not against the manifest weight of the evidence, the first assignment of error is overruled.

*Second Assignment of Error*

**{¶30}** In the second assignment of error, Kimble asserts that the trial court abused its discretion in denying his mid-trial motion for a continuance of the trial, which Kimble requested in order to procure the attendance of a potential defense witness who had not yet been served with a subpoena.

**{¶31}** With regard to this assignment of error, the record reflects that on the morning of February 28, 2024, which was the third day of trial, the prosecution rested its case. After the trial court ruled on Kimble's Crim.R. 29 motion for acquittal, the defense indicated it would be calling Hollie K. ("Hollie"), the mother of A.K.1 and A.K.2, as its first witness. In response, the prosecutor questioned whether Hollie had been served with a subpoena. Upon checking the case file, it

was learned that a defense subpoena issued for Hollie at her address in Licking County, Ohio had not been served, and a recess was then taken.

**{¶32}** Following the recess, the parties went back on record, at which time defense counsel noted that, in checking with the Licking County Sheriff's Office, she had learned that several attempts to serve Hollie at her residence had been unsuccessful. Defense counsel stated that the sheriff's office told her that, when making those attempts at service, no one would answer the door at that residence even though it appeared to the officers that persons were in the home at those times. Defense counsel noted that Hollie had been present, in person or via Zoom, for nearly all pretrials and prior hearings in the case, and defense counsel suggested that the inability to serve Hollie with the trial subpoena was due to nefariousness on Hollie's part.

**{¶33}** Defense counsel then stated, "I would request time to effectuate service as [the subpoena] has not been returned to our Clerk's office, that it was unclaimed or unserved." (Tr., 457). In response, the prosecution noted that Hollie had been in the courthouse earlier that week and that service could have been completed at that time. Defense counsel responded by saying the defense was unaware that Hollie had been present.

**{¶34}** Following that discussion, the trial court ruled as follows:

So I think the authority from the Third District is pretty clear on this case. The Court had done some research on this matter, and * * *

> [the] Court has no authority to compel a witness to appear until service of a subpoena has been completed.
>
> Unfortunately, we did not receive any return of service or failure to [*sic*] service notice from Licking County prior to start of trial, but this Court has no authority to compel any witness to appear who has not been served.
>
> As to – I'm not sure if Counsel is requesting a continuance, but if you could effectuate service prior to the completion of your case-in-chief, that is up to you, but we're going to proceed with the trial.
>
> This has been continued multiple times now and we need to proceed with this trial, okay?

(Tr., 458-459).

{¶35} In response to the court's ruling, Kimble's counsel stated that the defense was not asking for a continuance but requested a brief break in the proceedings in order to reach a local process server to see if he was available to serve the subpoena. The trial court granted that request and a recess was taken.

{¶36} Following that recess, counsel for the parties went back on record with the trial court, and defense counsel requested another recess in order to meet with the process server and attempt to effectuate service. The trial court granted that request, and another recess was taken.

{¶37} Following that second recess, counsel for the parties went back on record with the trial court, at which time defense counsel indicated that the defense was ready to proceed. The defense then presented its case, during which four witnesses – although not Hollie – were called to testify on Kimble's behalf. After

-17-

the last of those witnesses testified, the defense requested a short recess, which was granted by the trial court.

**{¶38}** Once back on record following the recess, Kimble's counsel moved for the admission of several exhibits. One of those exhibits, Defendant's Exhibit E, was an audio recording of an interview with Hollie that had been conducted by the investigator handling the case for the Seneca County Sheriff's Office. The defense asserted that Exhibit E should be admitted because Hollie was not available to testify at the trial. The prosecution objected to the admission of Exhibit E on the basis that Hollie had not testified and her statements in the interview were hearsay. Over the State's objection, the trial court admitted Exhibit E into evidence.

**{¶39}** The trial court then asked Kimble's counsel if the defense had other evidence to present. In response, Kimble's counsel stated that the defense had no other evidence to offer, but requested that the trial be continued until the following day in order to try to locate Hollie. The trial court denied that request for a continuance. In so doing, the trial court noted again that the trial had been continued multiple times, and stated that there was ample time left that same day for the presentation of closing arguments and the conclusion of the case. For those reasons, the trial court ordered that the trial would proceed without a continuance.

**{¶40}** On appeal, Kimble asserts that the trial court's refusal to grant the requested continuance amounts to reversible error. We disagree.

**{¶41}** "'The grant or denial of a continuance is a matter [that] is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.'" *State v. Jones*, 91 Ohio St.3d 335, 342 (2001), quoting *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). An abuse of discretion constitutes more than an error of judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams,* 62 Ohio St.2d 151, 157 (1980). In evaluating a motion for a continuance, "[s]everal factors can be considered: the length of the delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors." *State v. Landrum*, 53 Ohio St.3d 107, 115 (1990).

**{¶42}** However, as this Court noted in *State v. Urbina*, 2021-Ohio-4254 (3d Dist.), "'[i]t is a basic due process right * * * that a defense counsel be afforded the reasonable opportunity to prepare his case.'" *Id*., at ¶ 12, quoting *State v. Sowders*, 4 Ohio St.3d 143, 144 (1983). "Therefore, where the granting of a continuance is necessary to allow defense counsel a reasonable opportunity to prepare his case, the denial of a request for a continuance may violate the defendant's right to due process." *Urbina*, at ¶ 12. "But 'not every denial of a continuance constitutes a denial of due process.'" *Id*., quoting *State v. Broom*, 40 Ohio St.3d 277, 288 (1988). "Indeed, '[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in

-19-

the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" *Urbina*, at ¶ 12, quoting *State v. Unger*, *supra*, at 67. "'Weighed against any potential prejudice to a defendant are concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.'" *Id.*

**{¶43}** In the instant case, Kimble was indicted on December 21, 2022. The record reflects that the State of Ohio's initial discovery response, filed on December 29, 2022, listed Hollie as a potential witness, with an address in Johnstown, Ohio set forth as her last known address. Thus, the defense was aware of Hollie's name and residential address from that point forward.

**{¶44}** On January 23, 2023, the trial court first assigned a trial date in the case, scheduling a jury trial for March 9, 2023. Following that, the trial date was continued and rescheduled six different times by the trial court: twice on motions made by the prosecution, then twice on motions by the defense, then a fifth time on the court's own motion following Kimble's jury waiver, and then a sixth time due to Kimble and his counsel being ill with COVID. That sixth and final continuance was granted by judgment entry filed on December 12, 2023, at which time the trial court ordered that the rescheduled bench trial would begin on February 26, 2024. Therefore, when the trial court denied Kimble's mid-trial request for a continuance, the trial court was accurate in finding that multiple continuances of the trial date had previously occurred.

**{¶45}** Additionally, while the defense had notice of the February 26, 2024 trial date from on or about December 12, 2023, the record reveals that it was not until mid-February that the defense filed requests that subpoenas for trial be served on potential witnesses for Kimble, including Hollie. Specifically, the docket reflects that on February 14, 2024, the defense filed a subpoena for Hollie K. with a demand that she appear at trial on February 26, 2024 to give testimony and bring with her three electronic tablets. The praecipe requested that Hollie be served that subpoena at her Licking County address. While there is some indication in the trial record that Hollie subsequently may have purposely avoided being served with that subpoena, we find that the defense contributed to the delay in obtaining service on Hollie by waiting until just two weeks prior to trial to issue a subpoena for a witness residing out of county.

**{¶46}** The record is not clear as to what specific inconvenience, if any, would have resulted from granting the requested continuance. However, as the trial court noted in denying the continuance, the trial was nearly complete at the time the continuance was requested, and the trial court wished to conclude the trial proceedings that same day, which time permitted be done. Given that the trial had previously been continued multiple times, and that the three complaining witnesses were school-aged children who lived out of county or out of state and presumably had been required to miss school and travel significant distances to appear at trial, we find the trial court's concern with promptly concluding the trial on the third day

was reasonable, particularly in light of the court's right to manage its own docket and the public's interest in the prompt and efficient dispatch of justice.

**{¶47}** Further, while the requested continuance was one of brief duration, there is nothing to indicate that Hollie would have successfully been served with the subpoena in that time frame. We also note that the trial court had granted two recesses to the defense earlier that same day in order to permit them to make arrangements for service on Hollie, arrangements that were apparently unsuccessful.

**{¶48}** Most importantly, absent from defense counsel's request for a continuance was any type of proffer as to the expected nature or relevancy of Hollie's potential testimony, and therefore there is no indication that Kimble was actually prejudiced by the inability to call Hollie as a witness on his behalf. We also note, as set forth above, that the trial court permitted a recording of Hollie's interview with the investigating officer to be admitted into evidence over the state's seemingly valid objection.

**{¶49}** Therefore, based on the record before this Court, we find that Kimble has failed to show that prejudice resulted from the trial court's refusal to delay the conclusion of the trial, and the trial court did not abuse its discretion in denying the motion for a continuance.

**{¶50}** The second assignment of error is overruled.

*Third Assignment of Error*

**{¶51}** In the third assignment of error, Kimble argues that the trial court erred in granting the prosecution's mid-trial motion to quash a subpoena issued by the defense.

**{¶52}** With regard to this assignment of error, the record reflects that on the second day of trial, February 27, 2024, a lunch recess was taken during the continued presentation of the State's case-in-chief. Once back on record following that recess, and prior to calling the next prosecution witness, the State of Ohio requested to be heard on a matter related to a defense subpoena.

**{¶53}** The prosecutor indicated that the victim advocate handling the case had been handed a defense subpoena earlier that day. The subpoena at issue was for K.K., one of the alleged victims in the case, who had testified for the prosecution on the first day of trial and whose cross-examination by the defense had been conducted and concluded earlier on the second day of trial. The prosecution moved to quash the subpoena, on the basis that the person served was not a person designated by Crim.R. 17(D) who could be served and on the basis that K.K. is a Colorado resident and no mileage check accompanied the subpoena.

**{¶54}** In response, defense counsel noted that the witness list provided in discovery by the State of Ohio had listed K.K. in care of Victim's Assistance. Defense counsel represented that she had attempted to serve Ms. Anderson, the victim advocate, with K.K.'s subpoena but that Anderson said that

she would not accept service. Defense counsel added that, had an actual address for K.K. been provided, K.K. could have been served directly. On the issue of providing payment for mileage, defense counsel noted it was clear that K.K. was not currently in Colorado. Regardless of that fact, defense counsel offered to immediately drop off a check for mileage at the clerk's office for K.K. to pick up.

{¶55} The prosecutor then asserted that, pursuant to Crim.R. 17, the witness was entitled to mileage and fees for one day's attendance regardless of where she might be located when served with the subpoena. The State also reiterated its position that Crim.R. 17(D) requires that subpoena service be made upon the person named in the subpoena by delivering a copy thereof to that person, or by reading it to the person, or by leaving it at the person's usual place of residence.

{¶56} Defense counsel countered that argument by stating that the witness could not be served at her residence because she was not there, and again noted that an attempt to serve the subpoena on Ms. Anderson had been made but that Ms. Anderson would not accept service. Without indicating who it was she had spoken to, defense counsel stated that she had asked where K.K. was currently located and was told that nobody knows.

{¶57} The trial court then inquired of the prosecution how service of a subpoena could be effectuated if it was unknown where the person is located, to which the prosecutor responded that the witness had just been in the courtroom that morning and could have been served then. When the trial court inquired of defense

counsel why K.K. had not been served earlier that day or the day before when she was present at the courthouse, defense counsel stated that the defense had only decided to call K.K. as a witness following the conclusion of her testimony as a prosecution witness, and after K.K. had left the courthouse.

{¶58} The trial court then inquired of Ms. Anderson, the victim advocate, about her refusal to accept service of the subpoena. Ms. Anderson responded that she had no authority to accept service for the minor child, given the fact that K.K. had been discharged after her prior testimony and because she did not receive a defense subpoena prior to the start of trial. Defense counsel then argued that attorneys always have authority to accept service on behalf of a client, to which Ms. Anderson responded that she personally did not have authority from the child's parents to accept service.

{¶59} At that point, defense counsel asked for K.K.'s current location, noting that the State was providing compensation for witness accommodations during trial and therefore should know where K.K. was staying. In response to that, the prosecutor again argued that payment for mileage needed to be tendered at the time the subpoena was served.

{¶60} After those arguments were made, the trial court stated that it would review the matter over the next break and it could then be discussed further.

{¶61} The prosecution proceeded to present the testimony of three more witnesses and moved for admission of its exhibits. At 2:15 p.m. that day, following

the trial court's rulings on the admissibility of the exhibits offered by the State, the prosecution indicated that it was ready to rest its case. Discussion was then had by the court and counsel about a court view of Kimble's residence, and it was decided that the view would take place that afternoon, with the in-court proceedings to resume the following morning at 9:00.

{¶62} Before recessing for the day, the trial court stated that it needed some time to look into the subpoena issue and indicated the court would be doing that. Defense counsel again asked to be provided with the location of the witness, K.K., so that she could be served. Court was then adjourned until the next day.

{¶63} The following morning, on February 28, 2024, at 9:26 a.m., the trial court filed a judgment entry granting the State of Ohio's oral motion to quash the subpoena for K.K., with the judgment entry having been provided to counsel for the parties prior to the trial resuming. On the record that morning, defense counsel noted an objection to the court's ruling and again asked for the location of the witness so that she could be served. Defense counsel asserted that the State or, at the very least, the victim advocate, had to be aware of where K.K. could be located. In response to that, the prosecutor made a professional statement that, as an officer of the court, he did not know the present location of K.K., nor did he know the location of the Airbnb at which she and her family had been staying.

{¶64} The trial court noted the objection of defense counsel for the record, but ruled that its decision on the motion to quash remained the same, for the reasons stated in its judgment entry.

{¶65} On appeal, Kimble asserts that the trial court's granting the State's motion to quash the subpoena for K.K. was reversible error. Specifically, Kimble argues that the trial court's decision violated his right to due process and his right to confrontation of the witnesses against him.

{¶66} With regard to subpoenas in criminal cases, Crim.R. 17 provides in relevant part:

(A) **For Attendance of Witnesses; Form; Issuance.** Every subpoena issued by the clerk shall be under the seal of the court, shall state the name of the court and the title of the action, and shall command each person to whom it is directed to attend and give testimony at a time and place therein specified. The clerk shall issue a subpoena, or a subpoena for the production of documentary evidence, signed and sealed but otherwise in blank, to a party requesting it, who shall fill it in and file a copy thereof with the clerk before service.

* * *

(C) **For Production of Documentary Evidence.** A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein; but the court, upon motion made promptly and in any event made at or before the time specified in the subpoena for compliance therewith, may quash or modify the subpoena if compliance would be unreasonable or oppressive. * * *

(D) **Service.** A subpoena may be served by a sheriff, bailiff, coroner, clerk of court, constable, marshal, or a deputy of any, by a municipal or township policeman, by an attorney at law or by any person designated by order of the court who is not a party and is not less than eighteen years of age. Service of a subpoena upon a person named

therein shall be made by delivering a copy thereof to such person or by reading it to him in person or by leaving it at his usual place of residence, and by tendering to him upon demand the fees for one day's attendance and the mileage allowed by law. The person serving the subpoena shall file a return thereof with the clerk. If the witness being subpoenaed resides outside the county in which the court is located, the fees for one day's attendance and mileage shall be tendered without demand. The return may be forwarded through the postal service, or otherwise.

\* \* \*

**(F) Subpoena for a Hearing or Trial.** At the request of any party, subpoenas for attendance at a hearing or trial shall be issued by the clerk of the court in which the hearing or trial is held. A subpoena requiring the attendance of a witness at a hearing or trial may be served at any place within this state.

**{¶67}** To "quash" means "[t]o annul or make void; to terminate." Black's Law Dictionary (10th Ed. 2014). An appellate court applies an abuse of discretion standard when reviewing a trial court's decision to quash a subpoena. *State v. Hansen,* 2013–Ohio–1735, ¶ 31 (3d Dist.), citing *State v. Blair,* 2013–Ohio–646, ¶ 44 (3d Dist.) [citing *State v. Wasmus,* 10th Dist. No. 94APA07–1013 (Apr. 27, 1995); *State v. Strickland,* 2009–Ohio–3906, ¶ 37 (8th Dist)]. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶68}** In the instant case, we conclude that the trial court did act unreasonably, and therefore abused its discretion, in granting the prosecution's

motion to quash the defense subpoena for K.K. Had a motion to compel K.K.'s appearance and testimony pursuant to the subpoena been made by the defense, the trial court then could have properly ruled upon whether lawfully valid service had been effectuated. Alternatively, in anticipation of K.K. being called as a defense witness, the State of Ohio could have moved to quash the *service* of the subpoena. However, neither of those scenarios occurred in this case. Instead, under circumstances reflecting no issue with the validity of the subpoena itself (as opposed to the service thereof), the prosecution moved, without qualification, to quash – and therefore void – the subpoena, which the trial court granted. Therefore, on the facts of this case, we find the trial court's ruling to have been premature and overly broad, and an unreasonable exercise of the court's discretion.

{¶69} Having found that the trial court erred in quashing Kimble's subpoena for K.K., we move on to consider whether that error was harmless. As noted above, Kimble asserts that his constitutional right to confront a witness against him was violated when the trial court erroneously quashed the subpoena at issue.

{¶70} Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In a harmless-error review, "the state 'bears the burden of demonstrating that the error did not affect the substantial rights of the defendant.'" *State v. West*, 2022-Ohio-1556, ¶ 23, quoting *State v. Perry*, 2004-Ohio-297, ¶ 15. "'[W]hether the defendant's substantial rights were affected depends on whether the error was

prejudicial, i.e., whether it affected the outcome of the trial.'" *West*, at ¶ 23, citing *State v. Jones*, 2020-Ohio-3051, ¶ 18. But "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

{¶71} With regard to the specific claim here, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." "[T]his bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The right of confrontation "'means more than being allowed to confront the witness physically.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986), quoting *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Notably, the essential purpose of confrontation is to secure for the accused the opportunity of cross-examination. *Id.*

{¶72} In the instant case, following an extensive review of the record and upon careful consideration of all the evidence presented, we conclude that the error in quashing the subpoena for K.K. was harmless beyond a reasonable doubt. The evidence presented at trial in support of the indicted crimes was direct, uncomplicated, and essentially uncontroverted by all other evidence. While Kimble was unable to call K.K. as a witness in his own case once the subpoena was quashed by the trial court, K.K. had already testified at trial. Most importantly, K.K. had been subjected to a lengthy and comprehensive cross-examination by the defense

when on the witness stand, and there is no indication from the record that additional questioning would have impacted the outcome of the trial.

**{¶73}** Accordingly, for the reasons stated, the third assignment of error is overruled.

*Conclusion*

**{¶74}** Having found no error prejudicial to the defendant-appellant, Timothy Kimble, in the particulars assigned and argued, the judgment entered in the Seneca County Court of Common Pleas is affirmed.

***Judgment affirmed***

**ZIMMERMAN and WILLAMOWSKI, J.J., concur.**

**/jlm**